RECORD NO. 15-1547

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

### MCG, INC.,

*Plaintiff-Appellant,*

**v.**

### MGSJ HOLDINGS, INC., MICHAEL MOORE, GARY WARD and STEVEN MENDIETA,

*Defendants-Appellees.*

OPENING BRIEF OF PLAINTIFF-APPELLANT

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND AT BALTIMORE

Eric S. Lipsetts
ERIC LIPSETTS, P.A.
7 Willow Street, Suite 101
Annapolis, Maryland 21401
(410) 224-7631 (Telephone)
eric@lipsetts.com

Counsel for Plaintiff-Appellant -
  MCG, Inc.

## CORPORATE DISCLOSURE

In compliance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, the undersigned counsel for Appellant MCG, Inc. certifies that: (A) MCG is not a publicly held corporation or other publicly held entity; (B) MCG does not have any parent corporations; (C) no stock of MCG is owned by a publicly held corporation or other publicly held entity; (D) no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation; (E) MCG is not a trade association; and (F) this case does not arise out of a bankruptcy proceeding.


_/s/ Eric S. Lipsetts_
Eric S. Lipsetts

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE...................................................................i

TABLE OF CONTENTS..................................................................ii

TABLE OF AUTHORITIES............................................................vi

JURISDICTIONAL STATEMENT....................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW.......................1

STATEMENT OF THE CASE..........................................................3

I.    Background..............................................................................3

    A.    The Product.....................................................................3

    B.    Initial Fundraising Efforts...............................................4

    C.    Ward's And Moore's Promise...........................................5

    D.    The Aftermath Of Ward's and Moore's Promise.................6

    E.    Mendieta Secretly Holds Discussions About Taking An Interest In Holdings.............................................................7

    F.    The Documentation Of The Promise..................................7

    G.    Mendieta Moves Forward With Plans To Affiliate With Ward And Moore.....................................................................8

    H.    The ECRM Show.............................................................9

II.     The Contract And Its Breach..........................................................................10

        A.      Mendieta Takes An Interest In Holdings.............................................10

        B.      Paragraph 4 And The Contract's Execution.........................................11

        C.      The Efforts To Open The Paragraph 4 Bank Accounts......................12

        D.      Mendieta's Efforts To Raise Funds For Holdings...............................13

        E.      The "Walk Away"................................................................................14

        F.      The Ratification Resolution.................................................................17

PROCEDURAL HISTORY.........................................................................................19

THE APRIL 22 HEARING/RULINGS PRESENTED FOR REVIEW.......................21

SUMMARY OF ARGUMENT....................................................................................22

ARGUMENT...............................................................................................................24

I.      The Standards of Review......................................................................24

II.     The Trial Court's Rulings Cannot Be Affirmed Under R. 12(c)......................24

        A.      MCG Properly Pled That Mendieta Had Authority To Bind It...........25

        B.      MCG Properly Pled That The Condition Was Excused.....................25

        C.      There Were No Allegations Regarding Ratification...........................27

III.    The Trial Court's Rulings Cannot Be Affirmed Under R. 56.......................27

        A.      There Were Factual Disputes..............................................................28

iii

1.    The Factual Record Was Incomplete As To Whether Mendieta **Was** MCG's COO....................................................30

2.    The Factual Record Was Incomplete As To In Whose Interests Mendieta Was Acting When He Failed To Provide The Information Necessary To Open The Bank Accounts........31

3.    The Factual Record Was Incomplete As To Whether Mendieta Cancelled The Investment Agreement.....................32

B.    The Trial Court Made Errors Of Law....................................................33

1.    There Was A Contract Between The Parties.............................34

2.    MCG Cannot Be Deemed The Breaching Party.......................35

A.    The Condition Of Opening The Bank Accounts Was A Condition Precedent, Excusing Performance Until Satisfied Or Excused...............................................35

B.    The "Circumstances" Determine Whether The Condition Precedent Must Be Fulfilled Before Performance Is Due, Or Excused.....................................36

C.    The Time Period Was Too Short To Find Breach............37

3.    MCG Did Not Ratify Mendieta's Supposed Cancellation Of The Contract...............................................................................39

4.    The Trial Court Improperly Dismissed Claims Against Mendieta....................................................................................42

A.    Mendieta Was Not MCG.....................................................42

B.    The Trial Court Used The Wrong Standard In Evaluating Mendieta's Actions.......................................43

CONCLUSION...................................................................................................44

CERTIFICATE OF COMPLIANCE..................................................................46

CERTIFICATE OF SERVICE.............................................................................46

## TABLE OF AUTHORITIES

**<u>*CASES*</u>:**

Ace Development v. Harrison, 76 A.2d 566 (Md. 1950)..........................................32

Ambling Management v. University View Partners, 581 F. Supp. 2d 706
(D. Md. 2008) ......................................................................................26, 32, 37

Anderson v. Liberty Lobby, 477 U.S. 242 (1986)...........................................28, 32, 33

Campbell v. Hewitt, Coleman, 21 F.3d 52 (4th Cir. 1994).........................................27

Chiricella v. Erwin, 310 A.2d 555 (Md. 1973)...........................................................36

Clark v. United, 304 F. Supp. 2d 758 (M.D.N.C. 2004)............................................24

Danielwicz v. Arnold, 769 A.2d 274 (Md. Ct. Spec. App. 2001)...........................42

FDIC v. Staudinger, 797 F.2d 908 (10th Cir. 1986)..................................................40

Giannaris v. Cheng, 219 F. Supp. 2d 687 (D. Md. 2002)...........................................38

Greene v. National Car, 977 F.2d 572 (4th Cir. 1992)..............................................24

Havens v. Safeway, 678 P.2d 625 (Kan. 1984).....................................................38, 39

Kahn v. Schleisner, 166 A. 435 (Md. 1933)..............................................................26

Porter v. General Boiling, 396 A.2d 1090 (Md. 1979).........................................34, 35

Pryor v. United, 791 F.3d 488 (4th Cir. 2015)..........................................................24

Shapiro v. Greenfeld, 764 A.2d 270 (Md. Ct. Spec. App. 2000)................................43

Sirsi v. Craven, 815 F. Supp. 2d 931 (E.D.N.C. 2011)...............................................41

Thomas v. Potter, 325 F. Supp. 2d 596 (M.D.N.C. 2004)....................................27, 28

Tower Oaks Blvd. v. Procida, 100 A.3d 1255(Md. Ct. Spec. App. 2014)...........40, 41

Waller v. Waller, 187 Md. 185 (1946)........................................................................42

Webb v. Duvall, 11 A.2d 446 (Md. 1940)...................................................................40

***FEDERAL RULES*:**

Fed. R. Civ. P. 12(c)....................................................................1, 21, 22, 24, 25, 26, 27

Fed. R. Civ. P. 56...............................................................2, 20, 21, 22, 24, 26, 27, 33

***FEDERAL STATUTES*:**

28 U.S.C. § 1291.............................................................................................................1

28 U.S.C. § 1332.............................................................................................................1

28 U.S.C. § 1927.............................................................................................................1

***STATE STATUTES*:**

Corps & Ass'n, § 2-419(b)(2).......................................................................................43

***OTHER AUTHORITIES*:**

3 Corbin on Contracts...................................................................................................26

1 Fletcher Cyclopedia of the Law of Corporations (2015 rec. ed.)..........................42

5A Maryland Law Encyclopedia...................................................................................26

5C Wright & Miller, Federal Practice and Procedure...........................................24, 25

10A Wright & Miller, Federal Practice and Procedure..............................................28

JURISDICTIONAL STATEMENT

A.   Basis for the District Court's Subject Matter Jurisdiction: 28 U.S.C.

§ 1332 (diversity).

B.   Basis for Court of Appeals' Jurisdiction: 28 U.S.C. § 1291.

C.   Filing Dates:

1.   Date of Court decision appealed from: April 22, 2015.
2.   Date of Notice of Appeal: May 15, 2015.

D.   Final Judgment: The trial court's decision of April 22, 2015 disposed of

all claims then in the case. [1]

STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Whether the trial court erred in dismissing Plaintiff/Appellant MCG,
Inc.'s ("MCG") Second Amended Complaint ("Complaint") pursuant to
Fed. R. Civ. P. 12(c) on grounds (1) there was no contract between the
parties, because the corporate officer did not properly bind MCG, (2) if
there was a contract, MCG breached it by not fulfilling a condition
precedent, and (3) MCG ratified a cancellation of the contract, when MCG
pled (a) the person who signed was authorized to do so, (b) the condition
was excused due to Appellees Gary Ward's ("Ward") and Michael Moore's
("Moore") preventing its satisfaction, and (c) there were no allegations
regarding ratification in the Complaint, nor was ratification raised in any
answer.

---

[1]/  Subsequent to the issuance of the Court's April 22, 2015 order,
Appellees Ward, Moore and MGSJ Holdings, Inc. moved that the Court enter
judgment separately.  The Court did so on July 1, 2015.  All appellees also moved
for attorney's fees pursuant to 28 U.S.C. § 1927; that motion was denied on July 1,
2015.

1

2.   Whether the trial court erred, in granting summary judgment pursuant to R. 56, when the following material questions of fact had yet to be resolved:

    A.   Whether Appellee Steven Mendieta ("Mendieta"), then MCG's sole director, cancelled a contract that called for Ward, Moore and Appellee MGSJ Holdings, Inc. ("Holdings") (together, Ward, Moore and Holdings are referred to herein as the "MGSJ Defendants") to invest $2,500,000 in MCG;

    B.   Whether Mendieta had an interest in Holdings, and if so, what that interest was, when he was told he would have such an interest, and assuming he had an interest in Holdings, when he acquired that interest;

    C.   Whether Mendieta disclosed that interest to MCG;

    D.   Whether Mendieta failed to provide the information necessary to open bank accounts to satisfy a condition precedent in his capacity as the director of MCG, or in his capacity as an officer, director and/or shareholder in Holdings; and

    E.   Whether Mendieta was MCG's Chief Operating Officer ("COO").

3.   Whether the trial court erred in finding there was no "valid, binding agreement" between MCG and Ward and Moore, simply because Mendieta may have incorrectly signed a contract as MCG's COO;

4.   Whether the trial court erred when it found that MCG had breached the contract, or its formation was prevented, because a condition precedent had not yet been satisfied, regardless of the reason it was not satisfied;

5.   Whether the trial court erred in finding that MCG ratified Mendieta's supposed cancellation action of the contract, even if it did not know he had done so;

and

2

6.   Whether the trial court erred in dismissing claims against Mendieta on grounds that because he was MCG's sole director, he was MCG, accountable to only himself, and could do anything within his discretion.

STATEMENT OF THE CASE

This case centers around the breach of an Investment Agreement ("Investment Agreement" or "Contract"), pursuant to which Ward and Moore were to loan MCG $2,500,000 so that MCG could bring a revolutionary cosmetic product to the market.  After Ward and Moore promised that financing, MCG showed its product to retailers.  When the time came to finance, however, Ward and Moore, along with Mendieta, who had secretly taken an interest in Holdings, "walk[ed] away."  As a result, MCG incurred hundreds of thousands of dollars in mitigation damages, and damages attributable to lost profits.

I.    <u>Background.</u> [2]

A.    <u>The Product.</u>

In 2013, Paul Hetzel ("Hetzel"), an entrepreneur and inventor, and Karen Combest ("Combest"), a person with decades of experience in the cosmetic field,

_____

[2]/  "JA at __" refers to the page(s) referenced in the Joint Appendix, "No." to the USDC docket entry number, and when appropriate, the document included in the docket entry.  At times, only the Complaint is cited; only the Complaint is cited at times because issues raised by the MGSJ Defendants in their motions did not require production of evidence corroborating those particular allegations. Evidence produced in discovery but not part of the record corroborates the allegations in the Complaint.

3

conceptualized a product in which a user could combine his or her cell phone

cover with matching nail polish.  JA at 15 (Complaint [No. 2] ("Complaint"), ¶ 8);

see also JA at 124 (Hetzel Affidavit, March 30, 2015 ("Hetzel Aff. 2") [No. 75-9]

¶ 2); and see No. 56-2 (Combest resume), 56-6 (Hetzel resume).  The way the

product was to work was that the buyer would be supplied with a clear cell phone

cover and six inserts, three of which would be colors, three of which would be

patterns.  JA at 85-86 (excerpts of January 3, 2014 Presentation [No. 56-1]

("Presentation").  The inserts were such that they could be laid on top of the other;

for instance, if the user was a Cincinnati Bengals fan, he or she could lay a black

insert on the bottom, and then an orange, tiger-striped one on top, to replicate

Bengal colors.  The buyer was also supplied with three nail polish colors, so he or

she could match his or her nails to the color scheme he or she chose for the cell

phone cover.  JA at 86 (Presentation).

The product was to be called "My Color Games."  JA at 84 (Presentation).

There was no other product on the market like it.

B.    Initial Fundraising Efforts.

Combest knew of a cosmetic show scheduled for the first part of February

2014 in Denver Colorado (the "ECRM show").  Hetzel and Combest, however, did

not want to introduce the product to the market without financing for anticipated

4

production and marketing costs . JA at 16 (Complaint, ¶ 11). Accordingly, they sought funding for their idea, and in early December 2013 Hetzel brought Mendieta into the group to secure that funding. JA at 15 (Complaint, ¶ 10). Mendieta, Hetzel and Combest estimated a net profit in excess of $2,000,000 in the first year alone. JA at 17 (Complaint, ¶ 18).

Mendieta, a resident of North Carolina, knew Ward and Moore, also residents of North Carolina. See JA at 14 (Complaint, ¶ 3-5, all residents of North Carolina), JA at 15 (Complaint, ¶ 10, Mendieta knew Ward and Moore). Mendieta "pitched" MCG's idea to Ward and Moore, they were interested, and Mendieta scheduled a meeting for early January 2014, so that Ward and Moore could meet Hetzel and Combest, and hear about the product. JA at 15 (Complaint, ¶ 10).

C.    Ward's And Moore's Promise.

On January 3, 2014, Ward and Moore met with Hetzel, Mendieta and Combest, and heard a presentation about the product and projected profits. JA at 99-100 (Ward Answers to Interrogatories [No. 75-1], Answer to Interrogatory No. 19). According to MCG, after seeing the presentation and meeting MCG's principals, Ward and Moore promised to provide $2,500,000 in financing. JA at 16 (Complaint, ¶ 13). On or about January 7th, MCG contends, Ward and Moore confirmed they would make the investment. Id.

D.    <u>The Aftermath Of Ward's And Moore's Promise.</u>

On January 7th, Mendieta told MCG's anticipated banker, Andrew Kadala ("Kadala") of Morgan Stanley, to open two accounts, one for escrowed funds, the other for operating capital, so the funds Ward and Moore had promised could be deposited on the 8th.  <u>See</u> JA at 116 (Mendieta Affidavit [No. 75-6] ("Mendieta Aff."), ¶ 7) (indicating Hetzel on account).  Kadala opened those accounts, with Hetzel and Mendieta as signors.  <u>Id.</u>; <u>see also</u> No. 31-1, Exhibit 1-13A (Kadala e-mail re names on account).  Anticipating operating and production capital, the ECRM show was booked.  JA at 17 (Complaint, ¶ 16).

On that same day, Hetzel instructed that papers be drafted such that MCG was to be incorporated, with Mendieta the incorporator.  <u>See</u> JA at 124 (Hetzel Aff. 2, ¶ 3).  As to who were to be the officers, Hetzel and Mendieta agreed that once MCG was incorporated, Hetzel was to be ultimately in control of contracting and financing, and no such actions could be taken without his approval.  <u>Id.</u> at ¶¶ 3-4; <u>see also</u> JA at 16 (Complaint, ¶ 14).  Accordingly, on that same day Mendieta e-mailed one Jon Freed to arrange for business cards, which were to state that Hetzel was the President, and Mendieta the Chief Operating Officer ("COO").  JA at 130-31 (Mendieta e-mail to Freed re business cards [No. 75-13]).

6

On January 8, 2014, MCG was incorporated, with Mendieta the incorporator and, initially, sole director. JA at 91-94 (MCG Articles of Incorporation [No. 67-2]). Discussions then commenced regarding production and marketing.

### E. Mendieta Secretly Holds Discussions About Taking An Interest In Holdings.

On January 10th, however – that is, just (a) one week after the January 3rd presentation, (b) three days after Mendieta's January 7th instruction to open bank accounts, and (c) two days after MCG incorporated, Mendieta met with Ward. JA at 99-100 (Ward Answers to Interrogatories [No. 75-1], Answer to Interrogatory No. 19). According to the MGSJ Defendants, it was then that Mendieta and Ward decided to form a corporation that would consider investing in MCG, and Mendieta would be an equal partner. Id.

MCG contends Mendieta never disclosed that discussion to MCG, nor anyone then associated with MCG. JA at 125 (Hetzel Aff. 2, ¶ 5); see also JA at 17 (Complaint, ¶ 15).

### F. The Documentation Of The Promise.

On or about January 12, 2014, a draft agreement memorializing the terms of the promised financing was forwarded to Ward and Moore. The draft agreement

provided that the "Investor" would provide $500,000 in operating capital as a 5-year loan, with interest at 1.75%, and $2,000,000 to be used as a production line of credit, with advances accruing interest at 12%. See JA at 72-76 (MCG Investment Agreement [No. 19, Exhibit 2] ("Investment Agreement"). Once the $500,000 operating capital loan was paid back, Ward and Moore were to get a 10% interest in the company for $1.00. Id.

G.    Mendieta Moves Forward With Plans To Affiliate With Ward And Moore.

Mendieta continued to meet with Ward and/or Moore throughout January. See JA at 19 (Complaint, ¶ 24). It apparently was in this time period that Mendieta started drafting a Private Placement Memo, seeking $7,000,000 not only for MCG, but also for other companies in which he, Ward and Moore were contemplating taking an interest. JA at 83 (excerpt from Private Placement Memo [No. 40-5]) (seeking $7,000,000 for not only MCG but also for "Rejuvanetics," "Choice Nutrition Systems," "BCH Enterprises," "Southpoint Storage" and "Spero Global").

On February 3rd, the plans which Ward and Mendieta had been discussing crystallized; Ward, Mendieta, and Moore met in Dallas, NC, and determined that a company would be formed, to be owned equally by Ward, Moore, Mendieta and

8

one Jeffrey Wray ("Wray"), an associate of Ward's and Moore's.  JA at 106-07

(Holdings Answers to Interrogatories [No. 75-3], Answer to Interrogatory No. 14).

MCG contends Mendieta never revealed those plans or discussions to MCG, nor

anyone associated with MCG.  JA at 125 (Hetzel Aff. 2, ¶ 5); see also JA at 19

(Complaint, ¶ 25).

      H.    The ECRM Show.

From February 2-6, 2014, MCG showed its product to buyers from major

retailers at the ECRM show.  JA at 19-20 (Complaint, ¶ 26).  The buyers loved it;

as just one example, the buyer from Groupon said

> you have to be happy with the feedback from the retailers on the
> color/cellphone gift set.  My entire team is still talking about how cool the
> concept is.

No. 56-3; see also id. (re comments from other buyers).  All told, MCG received

what is known in the cosmetic industry as "hard" indications for 450,000 units, to

be delivered for the holiday season.  JA at 19-20 (Complaint, ¶ 26); see No. 56-3

(e-mail from Walgreens buyer referencing holidays). [3]

MCG apparently had a hot product, and now had a time frame in which it

had to deliver: the holiday season.

---

[3]/  Product has to be in the retailer's warehouses by September in order to
be ready for the "holiday season."

9

Combest told Mendieta of the results from the ECRM show. If Ward and Moore wanted to take their interest in MCG, they needed to (1) sign the Investment Agreement and (2) make the cash transfer of $2,500,000, as the people with MCG were getting impatient in that they had incurred obligations to produce 450,000 units, but still had no money for production. JA at 116 (Mendieta Aff., ¶ 5).

It is unclear as to whether Ward and Moore had $2,500,000 to invest; the MGSJ Defendants have only said that Ward and Moore had "over $1.4M in assets". JA at 89 (MGSJ Defendants' Supplemental Interrogatory Response) ("Supplemental Response"). This much is known: Ward and Moore sought to raise money from third-parties. Id.; see also No. 76 (raising issue as to whether MGSJ Defendants had sufficient funds to provide $2,500,000).

II.    The Contract And Its Breach.

A.    Mendieta Takes An Interest In Holdings.

On February 12th, Ward, Moore, Mendieta and Wray met in Durham NC and reviewed drafts of incorporation papers, bylaws and minutes regarding Holdings; Mendieta was to be a director, officer (Secretary) and 25% stockholder. JA at 109-14 (Holdings minutes [No. 75-4]). Mendieta was tasked to call a local lawyer

10

to complete the incorporation.  Id.; see also JA at 107 (Holdings Answers to Interrogatories [No. 75-3], Answer to Interrogatory No. 14).

MCG contends Mendieta never revealed this interest in Holdings to MCG, nor anyone associated with MCG.  JA at 125 (Hetzel Aff. 2, ¶ 5); see also JA at 23 (Complaint, ¶ 39).

B.    Paragraph 4 And The Contract's Execution.

Having reviewed papers regarding Holdings' incorporation, Ward and Moore also reviewed the Investment Agreement that had been forwarded to them a month earlier.  JA at 116 (Mendieta Aff., ¶¶ 5-6).  Ward and Moore wanted to make a change; they wanted to insert a clause stating that the only signors on the bank accounts into which funds would be deposited would be Mendieta and Wray. Id.  Mendieta called Hetzel and asked for his approval of this change, Hetzel approved.  Id. at ¶¶ 8-9.  Mendieta then drafted what came to be Paragraph 4 of the Investment Agreement.  Id. at ¶ 10.

Paragraph 4 provided that:

As a condition of Investor providing the two loans, MCG bank accounts [shall] bear two signors only, Steve Mendieta and, as a back-up, Jeff Wray. MCG must keep these two signors for the period until the full $2.5M has been repaid in full.  At that time, MCG can add and remove signors as directed by the MCG Board

(the "Paragraph 4 bank accounts").   JA at 73 (Investment Agreement, ¶ 4).

11

With that paragraph inserted, Mendieta signed the Investment Agreement, on behalf of MCG, as "COO". JA at 76. Ward and Moore signed as "principals" of Holdings, id.; Holdings, however, had yet to be incorporated. E.g. No. 75-14 (Holdings Response to Requests for Admissions at 3, Response to RFA No. 7).

The monetary and other terms of the Investment Agreement were the same as the draft provided to Ward and Moore in January, $500,000 was to be loaned for operating capital, $2,000,000 as a line of credit for production costs, and they could purchase a 10% interest in the company for $1.00 once the $500,000 was re-paid. JA at 72-76 (Investment Agreement).

Mendieta sent the executed agreement to the persons working with MCG. No objections were raised to Mendieta's signing the agreement as COO.

C.    The Efforts To Open The Paragraph 4 Bank Accounts.

Because the Investment Agreement provided that funds were to be deposited into accounts upon which only Mendieta and Wray were to be the signatories, at Hetzel's instruction, Kadala promptly started working on getting those accounts opened. On February 14th, Kadala inquired, within Morgan Stanley, if the previously established accounts – upon which Hetzel and Mendieta were authorized signors – could be used, with just name changes. No. 31-1, Exhibit 1-13A (Kadala February 14th e-mail); Morgan Stanley's compliance

12

division informed Kadala that new accounts had to be opened.  JA at 78 (Hetzel
Affidavit, July 11, 2014) ["Hetzel Aff. 1"] [No. 31-1], ¶ 8).  To open a new set of
accounts Morgan Stanley needed information on all "interested" parties, here,
Wray, one of the indicated signors, and possibly Ward and Moore, who were to be
the funders.  See No. 31-1, Exhibit 1-13C (Kadala February 18th e-mail).
Accordingly, Kadala called Mendieta, and told him he (Kadala) needed
information regarding those to be the signors on the accounts.  See No. 31-1,
Exhibit 1-4 (Mendieta text to Hetzel stating Kadala working on signors).

Mendieta did not supply it.  JA at 22, (Complaint, ¶ 36).  Rather, his
attention was apparently on raising funds for what was to become Holdings.

### D.    Mendieta's Efforts To Raise Funds for Holdings.

On February 16th, Mendieta sent the Private Placement Memo seeking
$7,000,000 to one "Dave Yerger" and to "Jed".  JA at 81 (February 16th e-mail
from Mendieta to Yerger [No. 40-5]). [4]  Notwithstanding that the money was
apparently not in hand, on that same day, February 16th, Mendieta reported to
Hetzel that Wray had told him $500,000 would be wired on the 18th.  No. 31-1,

---

[4]/  Beyond providing documents with Yerger's and "Jed's" name on them,
the MGSJ Defendants provided no further information as to what role they played
in the circumstances leading to the breach complained of.  MCG was unable to
depose the MGSJ Defendants regarding who Yerger and "Jed" were, due to the
trial court's dismissal of the case before such depositions could take place.

Exhibit 1-5 (Mendieta e-mail re wire). On the 18th, and still without the information needed to open the accounts, Kadala e-mailed Mendieta, asking Mendieta to call his assistant because he (Kadala) needed information on the "interested" parties. No. 31-1, Exhibit 1-13C (Kadala February 18th e-mail).

Mendieta e-mailed back that he would contact Kadala's assistant. No. 31-1, Exhibit 1-13D (Mendieta February 18th e-mail). He never did. JA at 34 (Complaint, ¶ 80).

E.     The "Walk Away."

On February 18th, Holdings was incorporated. No. 31-2; see also JA at 121 (Ward Responses to Requests for Admissions [No. 75-8], ("Ward Responses RFA"), Response to No. 22 (admitting Holdings incorporated on February 18, 2014). The next day (the 19th), around 4 PM, Mendieta met with Ward and Moore; according to Mendieta, he, Ward and Moore were then having a "heart-to-heart." No. 31-1, Exhibit 1-10 (Mendieta 4:36 PM text). Mendieta told Hetzel he would send an e-mail after he (Mendieta) was finished coaching soccer. Id.

That e-mail was a bombshell.

In the early morning hours of February 20, 2014, Mendieta sent the e-mail he had promised to the other persons working with MCG. That e-mail announced that he, Ward and Moore were "walk[ing] away" from MCG. Mendieta wrote:

14

> I spent several hours today meeting with Mike and Gary ....  I have had a
> hard time convincing Mike and Gary to partner with you on MCG. ...  Based
> on several conversation, texts and comments from you, ... I personally have
> become very uncomfortable with investing in MCG. ...  There has been a
> lack of delineation in the leadership of the company.  <u>My nervousness,
> coupled with theirs, is causing us all to walk away from this deal</u>.

JA at 118-19 (Mendieta February 20th 12:04 AM e-mail [No. 75-7] ("Mendieta

2/20 e-mail")) (emphasis added).

Shortly after receipt of Mendieta's e-mail, Combest texted Ward, asking

whether it was true that Holdings was no longer interested in investing and

seeking to talk, but received no response.  No. 31-1, Exhibit 1-12 (Combest text);

<u>see</u> JA at 122 (Ward Responses RFA, Response to No. 52) (admitting received

text but claiming did not read on day sent).  Neither Ward nor Moore gave MCG

written notice of their intent to not perform.  <u>See</u> JA at 104-05 (Holdings Answers

to Interrogatories [No. 75-3], Answer to Interrogatory No. 9); <u>see also</u> JA at 74-75

(Investment Agreement, ¶ 10) (notice requirement).  Rather, they just "walked

away," apparently hoping MCG would do so also.

Why did Moore and Ward "walk away" on the 19th from an investment that

would pay 12% interest, plus an interest in a company after the capital loan was

paid back, when on the 15th, Mendieta had reported, Wray had told him that

$500,000 would be wired on the 18th?  There is contradictory evidence as to what

15

happened on February 19, 2014, six different explanations having been proffered, from: (1) Ward and Moore were "nervous" about their investment, to (2) Ward and Moore were concerned that the bank accounts had not been opened, to (3) Mendieta unilaterally cancelled the contract, even though Ward and Moore were ready to wire $500,000 (the latest version).  See JA at 118-19 (Mendieta 2/20 e-mail) (re nervousness); JA at 117 (Mendieta Aff., ¶ 18) (re concerns re bank accounts); JA at 89 (Supplemental Response) (prepared to wire $500,000); No. 67-1 (re Mendieta unilaterally cancelling agreement); see also No. 75 at 12 (listing and citing all explanations).

Multiple explanations have also been provided as to who cancelled the agreement, from (1) no one actually cancelled it, they all just "walked away," to (2) Ward and Moore thought it was not in Holdings' best interests to go forward and cancelled the Investment Agreement, to (3) Mendieta unilaterally terminated it and Ward and Moore "acquiesced."  See JA at 118-19 (Mendieta 2/20 e-mail) (all "walked away"); No. 75-1 Ward Answers to Interrogatories, Answer to Interrogatory No. 12 (not in best interests), see also No. 26-1 at 1 (MGSJ refused to fund loan and cancelled Investment Agreement); JA at 89 (Supplemental Response) (Mendieta unilaterally cancelled), No. 67-1 at 3 (MGSJ Defendants "merely" accepted termination).  Perhaps the best explanation is found in a

16

Mendieta e-mail indicating that someone named "Cesar," with whom Ward and Moore were apparently working, instructed that MCG be "pulled out" of the mix of companies for which Ward and Moore were seeking funding. JA at 129 (February 24th Mendieta e-mail [No. 75-11]) ("need to update Jed and Dave on the changes because he (Cesar) pulled [MCG] out").

And why did MCG not just "walk away"? MCG could not have just "walked away" because, due to Ward's and Moore's January 7th promise of funding, MCG had already shown its product, it had buyers clamoring for it, and if MCG "walked away," it would have been difficult, to say the least, to re-introduce the product to the market at some later time. Thus, it had to move forward.

F.     The Ratification Resolution.

To move forward, on February 25, 2014, Mendieta appointed Hetzel as his successor director and resigned. JA at 87 (Mendieta resignation) (produced during April 22, 2015 hearing). Hetzel then called an organizational meeting of MCG, a Board was appointed, officers elected, and routine resolutions passed, including a routine ratification resolution. That resolution read as follows:

> RESOLVED: That any and all actions taken or contracts entered into heretofore by any officer and/or director for the Corporation, either as officer and/or director, as well as any and all actions taken or contracts entered into by said persons as individuals acting for the Corporation be and the same are hereby ratified, approved and confirmed by the Corporation,

17

and all such contracts adopted as though said individual had at such time full power and authority to act for and by the Corporation and in the same manner as if each and every act had been done pursuant to the specific authorization of the Corporation.

JA at 95-97 (MCG Minutes, [No. 67-3]).

At that time, the only information the Board had regarding the Investment Agreement was (1) that Mendieta had signed it on MCG's behalf, and (2) with Ward having not responded to Combest's text asking what happened, the information in Mendieta's February 20th e-mail, which made no mention of Mendieta's taking any corporate action on behalf of MCG.  JA at 78 (Hetzel Aff. 2, ¶¶ 6-8, 11), 118-19 (Mendieta 2/20 e-mail).  The Board had no reason to suspect that Mendieta had, on its behalf, cancelled the essential funding it needed to bring its product to the market.

Subsequent to the Board meeting, MCG entered the market without Ward's and Moore's financing, resulting in its ordering a much-reduced volume at a higher per-unit cost.  It incurred hundreds of thousands of dollars in mitigation costs, and damages attributable to lost profits.  JA at 26-27 (Complaint, ¶¶ 50-51). [5]

---

[5]/  Documents produced in discovery corroborate MCG's damage claims.

18

## PROCEDURAL HISTORY

In March 2014 the case was filed in the Circuit Court for Anne Arundel County, Maryland, with Ward, Moore and Holdings as defendants.  No. 19.  In June 2014, Ward, Moore and Holdings moved to dismiss, primarily on grounds that the condition precedent of opening the bank accounts had not been satisfied.  No. 26.  MCG opposed that motion, No. 31, and filed an amended complaint alleging excuse for the failure to satisfy the condition precedent, No. 30.

On September 5, 2014, the matter came before the Circuit Court; the Defendants' motion was denied.  No. 37.

Following the denial of the Defendants' motion, written discovery was exchanged.  Ward's and Moore's answers to interrogatories revealed their discussions with Mendieta regarding his taking an interest in Holdings.  Based on this information, MCG moved to add Mendieta as a party, indicating it would plead, in the alternative to claims that the MGSJ Defendants breached, that Mendieta had interfered with the Investment Agreement and deceived it by not revealing his interest in Holdings.  No. 39.

The MGSJ Defendants opposed that motion on the same grounds as asserted before.  No. 42.  MCG's motion to add Mendieta was granted, No. 47, and in December 2014 Mendieta was joined in a second amended complaint, No. 54.

19

All parties being diverse, on December 23, 2014, Mendieta removed the case to the U.S. District Court for the District of Maryland.  No. 1.

The trial court held a scheduling conference on February 17, 2015.  No. 16. During that conference, the MGSJ Defendants indicated they intended to move for judgment on the pleadings.  On February 25, 2014, written discovery was served upon Mendieta.  On or about March 4, 2015, Ward, Moore and Holdings filed a Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment, claiming, for the first time, that Mendieta had unilaterally cancelled the Investment Agreement, and they merely "acquiesced" in that cancellation.  No. 67-1 at 1, 3.  They also claimed that MCG ratified Mendieta's action.  Id. at 2.  MCG timely opposed that motion, noting in particular that when the ratification resolution was passed, MCG had no knowledge that Mendieta had taken any such action.  As to the claim that Mendieta had unilaterally cancelled the Investment Agreement just when the MGSJ Defendants were ready to wire $500,000, MCG claimed that discovery was necessary, and supported that claim with a Rule 56(d) affidavit from Hetzel.  No. 75 at 11-14; see also JA at 77-80 (Hetzel Aff. 2).

MCG then asked counsel for the MGSJ Defendants for dates to take his clients' depositions.  No. 75-16.  Counsel refused to produce his clients, id. and moved for a protective order, No. 69.  Mendieta failed to respond to the written

20

discovery served upon him, and joined the MGSJ Defendants' motions. Nos. 73, 74 (joining motions) and 79.

Faced with all of the defendants' refusal to participate in discovery, MCG asked the court, pursuant to its standing order regarding discovery, for a discovery conference. No. 76. The Court scheduled a hearing for April 22, 2015. No. 77.

THE APRIL 22 HEARING/RULINGS PRESENTED FOR REVIEW

On April 22, 2015, the trial court, pursuant to Fed. R. Civ. P. 12(c) (Judgment on the Pleadings) and R. 56 (Summary Judgment), dismissed MCG's claims, on three grounds: (1) there was no contract between MCG and Ward and Moore, because Mendieta had signed the Investment Agreement as MCG's "COO," (2) assuming there was a contract between the parties, MCG breached it because the Paragraph 4 bank accounts were not opened, regardless of the reason, and (3) MCG ratified Mendieta's supposed cancellation of the Contract, even if MCG didn't know that Mendieta had taken such action. JA at 148 [No. 105] (excerpt of Transcript of 4/22 hearing (Afternoon Session) ["Transcript"], l. 4-5) (referencing both rules), JA at 151 (Transcript, l. 1-17) (same). Finding that the same set of facts would resolve MCG's claims against Mendieta, the trial court dismissed the tort claims against him. JA at 141 (Transcript, l. 11-23). Having dismissed all claims (including a claim for a declaratory judgment), the Court

ruled that Ward's, Moore's and Holdings' motion for a protective order was moot, as was MCG's request for a discovery conference.  JA at 142 (Transcript, l. 6-7); see also JA at 152-54 (Order, April 22, 2015) [No. 85]).

MCG's Notice of Appeal was filed on May 15, 2015.  JA at 158-59 (Notice of Appeal [No. 92]).

## SUMMARY OF ARGUMENT

To the extent the trial court dismissed MCG's Second Amended Complaint pursuant to R. 12(c)/Judgment on the Pleadings, the court erred because (1) MCG properly alleged that Mendieta had authority to enter into the Investment Agreement on behalf of MCG, and (2) MCG properly alleged that the condition of transferring funds to the Paragraph 4 bank accounts was excused due to Ward's, Moore's and Holdings' failure to provide the information necessary to get those accounts open.  The third basis for the Court's decision – that MCG ratified Mendieta's supposed cancellation of the Investment Agreement – was not pled in MCG's Complaint nor raised in any answer, and therefore R. 12(c) is inapposite.

To the extent the trial court dismissed MCG's complaint pursuant to R. 56, the court erred because there were material facts as to which it cannot be said were not in dispute, such as (1) whether Mendieta was MCG's Chief Operating Officer such that he properly signed the Investment Agreement as "COO," (2) what

22

interest Mendieta had in Holdings, (3) whether Mendieta failed to provide the information necessary to open the Paragraph 4 bank accounts in his capacity as an officer and director of Holdings, and (4) whether Mendieta actually cancelled the Investment Agreement on behalf of MCG.

The trial court also erred, as a matter of law, when it held

(1) there was no "valid binding agreement" simply because Mendieta signed as "COO," there clearly being a meeting of the minds between MCG, Ward and Moore as to all material terms of their investment, and the parties' subsequent conduct showing assent;

(2) the condition precedent of opening the bank accounts was not fulfilled, and the ratification ineffective, "regardless of the circumstances of its fulfillment," when the circumstances determine whether a condition must be satisfied before performance is due, or is excused;

(3) MCG breached the Investment Agreement when it failed to get the bank accounts open, as the time period between the date of execution and the "walk away" was too short for Defendants to claim abandonment;

(4) MCG ratified Mendieta's supposed cancellation of the Investment Agreement, even if MCG had no knowledge that he had taken such action;

and

(5) Mendieta was MCG and had no fiduciary duty to the company itself, when a corporation is an entity separate from its directors.

## ARGUMENT

### I.    The Standards of Review

Fed. R. Civ. P. 12(c) - When evaluating a R. 12(c) motion, the trial court must view the facts presented in the pleadings, and the inferences therefrom, in a light most favorable to the non-moving party, accept as true all allegations made by the non-movant, and reject as false all contravening assertions in the moving party's pleadings. E.g. Clark v. United, 304 F. Supp. 2d 758, 763 (M.D.N.C. 2004). The appellate court reviews de novo a district court's grant of a R. 12(c) motion for judgment on the pleadings. E.g. Greene v. National Car, 977 F.2d 572 (4th Cir. 1992).

Fed. R. Civ. P. 56 - Summary judgment can be granted only when there are no material disputes as to fact, and the movant is entitled to judgment as a matter of law. R. 56. The appellate court reviews the district court's grant of summary judgment de novo. Pryor v. United, 791 F.3d, 488, 495 (4th Cir. 2015).

### II.    The Trial Court's Rulings Cannot Be Affirmed Under R. 12(c).

The trial court held that it was ruling pursuant to R. 12(c) and R. 56. JA at 148 (Transcript, l. 4-5), 151 (l. 1-17). In ruling on a 12(c) motion, all facts and inferences therefrom are to be construed in favor of the non-movant. E.g. Clark, supra; see generally 5C Wright & Miller, Federal Practice and Procedure, ¶ 1368.

24

If the trial court's rulings here are to be evaluated under R. 12(c)'s standards, its decisions must be reversed.

A.    MCG Properly Pled That Mendieta Had Authority To Bind It.

As to the first ground upon which the trial court dismissed MCG's complaint – that Mendieta, by signing as MCG's COO, did not properly bind MCG to the Contract – MCG's Complaint alleged that "Mendieta signed the Investment Agreement on behalf of MCG, as he was authorized to do by Hetzel." JA at 21 (Complaint, ¶ 31).   If the trial court's decision on this ground is to be evaluated under R. 12(c), the trial court was legally obligated to accept as true the allegation that Mendieta was authorized to execute the Contract on MCG's behalf, and by his signature, bound MCG to its terms.  Thus, if evaluated under R. 12(c)'s standards, the trial court erred in finding that Mendieta did not bind MCG. [6]

B.    MCG Properly Pled That The Condition Was Excused.

As to the second basis for the trial court's ruling – that is, assuming there was a contract, MCG breached it by not getting the Paragraph 4 bank accounts open between February 12th and 19th – it is well-established that where cooperation is necessary to the performance of a condition, a duty to cooperate will be implied,

---

[6]/  Issues regarding the impact of Mendieta's signing as "COO" are addressed in Sections III.A.1 and III.B.1, infra.

and that a party owing such a duty cannot prevail if such failure operates to hinder or prevent performance of the condition.  E.g., Ambling Management v. University View Partners, 581 F. Supp. 2d 706, 715 (D. Md. 2008) (party cannot engage in conduct that prevents the other party from performing and then use that as an excuse for not performing); see also 3 Corbin on Contracts, § 571 ("if one prevents the other from performing a condition precedent ... such prevention may eliminate the condition precedent"); 5A Maryland Law Encyclopedia (Contracts), § 94 at 360 (where the existence of contract to lend money is contingent on the happening of a certain event, and promisor prevents the event from taking place, the condition is dispensed with); Kahn v. Schleisner, 166 A. 435, 438-39 (Md. 1933) (same).

Here, MCG factually alleged that Holdings, Ward and Moore "failed to provide the necessary information to open the bank account ...", and their "failure to provide the necessary information operated to hinder or prevent performance of the condition."  JA at 27 (Complaint, ¶ 54) (re Holdings), JA at 29 (Complaint, ¶ 59) (re Ward and Moore).  MCG also pled Holdings, Ward and Moore breached the implied duty to cooperate, and thus the condition was excused.  Id.

The trial court was obligated under R. 12(c) to accept these allegations as true.  Since the allegations establish a basis for excusing the condition, the MGSJ

Defendants were not entitled to judgment on the pleadings.  Thus, to the extent the trial court ruled pursuant to R. 12(c) that MCG breached, it erred.

### C.   There Were No Allegations Regarding Ratification.

To the extent the trial court relied upon MCG's supposed ratification of Mendieta's supposed cancellation of the Contract, there are no allegations in the Complaint, nor in the answers, referencing the ratification resolution. Accordingly, the last basis for the dismissal cannot fall under R. 12(c).

For the reasons stated above, the trial court's rulings cannot be affirmed under R. 12(c).  Those rulings similarly cannot be affirmed under R. 56.

### III.   The Trial Court's Rulings Cannot Be Affirmed Under R. 56.

Pursuant to Fed. R. Civ. P. 56, summary judgment can be granted only when there are no material disputes as to fact, and the movant is entitled to judgment as a matter of law.  When dispositive facts are disputed, or the moving party does not show there is no genuine dispute regarding them, however, summary judgment is not appropriate.  See Campbell v. Hewitt, Coleman, 21 F.3d 52, 55 (4th Cir. 1994) (court should only grant summary judgment when record shows right to judgment); see also Thomas v. Potter, 325 F. Supp. 2d 596, 602 (M.D.N.C. 2004) (same); see generally 10A Wright & Miller, Federal Practice and Procedure, § 2725.

27

Here, (1) the factual record was not complete such that it can be said there were no material disputes as to fact, and (2) the court erred, as a matter of law, in granting judgment on the grounds upon which it dismissed MCG's claims.

A.    There Were Factual Disputes.

At the time the trial court ruled, written discovery had been exchanged between MCG and the MGSJ Defendants, but that was all; the MGSJ Defendants refused to allow their depositions to be taken, and Mendieta refused to even answer written discovery.  Notwithstanding that the factual record was incomplete, the trial court's rulings are apparently based on eight, largely ministerial facts that did not address the substance of what happened:

(1) MCG's Articles of Incorporation were signed by Mendieta, JA at 135 (Transcript, l. 24-25);

(2) Mendieta was MCG's sole director through February 24, 2014, JA at 136 (Transcript, l. 8-9) (sole director), JA at 140 (Transcript, l. 6-7) (prior to February 24);

(3) in February 2014 there was an MCG Investment Agreement, JA at 136 (Transcript, l. 14-15);

(4) negotiations preceded the execution of the Investment Agreement, id., l. 15-17;

(5) Ward and Moore signed on behalf of Holdings, id., l. 17-19;

(6) Holdings was not yet in existence when the Investment Agreement was signed by Ward and Moore, id., l. 24-25;

28

(7) Mendieta signed the Investment Agreement as MCG's "COO"; JA at 144 (Transcript, l. 13-16); and

(8) the condition precedent of opening the Paragraph 4 bank accounts was not fulfilled, JA at 138-39 (Transcript, l. 25- l. 1-4).

These facts are indeed undisputed. It is <u>not</u> undisputed, however, as to whether Mendieta was in fact MCG's COO, it is <u>not</u> undisputed in whose interest Mendieta was acting when he failed to provide the information necessary to get the Paragraph 4 bank accounts open, and it is <u>not</u> undisputed as to what MCG ratified. All of those facts are material, in that they determine (1) whether Mendieta properly represented himself as MCG's COO (and if so, there would be no question that the parties entered into a binding contract), (2) whether the condition was excused (and if so, the MGSJ Defendants would have been obligated to perform, and they did not), and (3) whether MCG ratified a supposed action (and if it did not, the defendants would have no affirmative defense based on ratification). <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986) (fact is material if it might affect outcome of suit). Accordingly, with material facts not undisputed, the trial court erred in granting summary judgment.

29

1.    The Factual Record Was Incomplete As To Whether Mendieta
      **Was** MCG's COO.

The trial court held the Investment Agreement was not a "valid, binding agreement" because Mendieta did not have legal authority to sign as COO.  JA at 137 (Transcript, l. 14-16).  There was, however, already evidence in the record as to whether Mendieta was, in fact, MCG's COO.

Mendieta affied he was MCG's COO.  JA at 115 (Mendieta Aff., ¶ 2). Consistent with that representation, Mendieta had instructed that a business card be made indicating he was MCG's COO.  JA at 130-31 (Jan. 7th e-mail to Freed [No. 75-13]).  Moreover, Mendieta apparently told Ward and Moore he was MCG's COO.  No. 75-1 (Ward Answer to Interrogatories, at 8, Answer to Interrogatory No. 12) (Mendieta had authority as MCG's COO).

Mendieta obviously thought he was MCG's COO.  MCG took no exception to Mendieta's signing the Investment Agreement as its COO.

There thus was already sufficient evidence to indicate that, as of February 12th, Mendieta was MCG's Chief Operating Officer.  To the extent there was any question as to his corporate status, discovery could have determined whether, after MCG was incorporated, Mendieta, in his capacity as a director, appointed himself as COO.  If discovery revealed that Mendieta was MCG's COO, the trial court's

decision that the Agreement was not a "valid, binding agreement" because Mendieta did not have legal authority to sign as COO would be incorrect, as he <u>was</u> MCG's COO.

> 2.      The Factual Record Was Incomplete As To In Whose Interests Mendieta Was Acting When He Failed To Provide The <u>Information Necessary To Open The Bank Accounts.</u>

On at least three occasions, Kadala asked Mendieta to provide information so that the Paragraph 4 bank accounts could be opened.  It is uncontested that Mendieta never provided that information.

Did Mendieta have an interest in Holdings?  If so, what was that interest? Did he have such an interest after the Investment Agreement was signed, such that it could be said he was in dual roles after February 12th, when he failed to provide information to open the Paragraph 4 bank accounts?  If Mendieta had an interest in Holdings, in whose interests was Mendieta acting when he failed to provide the information necessary to open the bank accounts?  The MGSJ Defendants have not provided any evidence regarding these questions, and Mendieta refused to even participate in written discovery.

If Mendieta refused to provide the information necessary to open the Paragraph 4 bank accounts in his own capacity as an officer and director of Holdings, then the condition regarding the bank accounts could be excused.

Ambling, supra.  Thus, the factual issue of in whose interest Mendieta was acting

is material, Anderson, supra, because if the condition was excused, MCG could

not have breached an excused condition.

> 3.     The Factual Record Was Incomplete As To Whether Mendieta
>        Cancelled The Investment Agreement.

The trial court made no findings as to who cancelled the Investment

Agreement.  Who cancelled it, and on whose behalf, determines whether MCG

ratified a cancellation, as if no corporate action was taken on MCG's behalf, MCG

could not have ratified something that did not happen.

Mendieta never said he cancelled the Contract.  In his February 20th e-mail,

Mendieta said nothing about taking corporate action, but rather just that he,

personally, and Ward and Moore had decided to "walk away" from the "deal."  JA

at 118-19 (Mendieta 2/20 e-mail).  Indeed, in the Mendieta affidavit the MGSJ

Defendants submitted, Mendieta said nothing about his cancelling the contract.

JA at 117 (Mendieta Aff., ¶ 20).

A director is not absorbed by a corporation, and an act done on behalf of a

corporation is one thing, while an act done in the director's personal capacity is

another.  Ace Development v. Harrison, 76 A.2d 566, 570 (Md. 1950).  Thus,

perhaps Mendieta took no corporate action at all, as his February 20th e-mail actually says; rather, he just "walked away" with Ward and Moore.

What actually happened on February 19th?  Did Mendieta "unilaterally" cancel the Investment Agreement, as the MGSJ Defendants' Supplemental Response says, or did he just walk away, as Mendieta's February 20th e-mail says?  Or did "Cesar" instruct Mendieta, Ward or Moore to take MCG out of the mix of companies for which Holdings was seeking funding, such that the decision to "walk away" was made by Holdings?  The determination of what, if any, corporate action was taken on behalf of MCG is material, <u>Anderson</u>, <u>supra</u>, because if Mendieta did not cancel the Investment Agreement in his capacity as an officer or director of MCG, MCG could not have ratified something that did not happen.

With all of these material facts undeveloped, it simply cannot be said that material facts were undisputed.  Accordingly, the trial court erred in granting summary judgment.

B.     <u>The Trial Court Made Errors Of Law.</u>

Not only should the factual disputes set forth <u>supra</u> have precluded summary judgment (or at least caused the trial court to defer ruling as per R. 56(d)), but also it is properly said that the defendants were not entitled to judgment as a matter of law.

33

1.    <u>There Was A Contract Between The Parties.</u>

The trial court found that the Investment Agreement was not a valid, binding contract because Mendieta did not have legal authority to sign as COO. JA at 137 (Transcript, l. 14-16). [7]  It has been long established that a signature is not necessarily required to bring a contract into existence; the issue is assent, and the purpose of a signature is to demonstrate mutuality of assent, which can also be shown by the conduct of the parties.  <u>E.g.</u>, <u>Porter v. General Boiling</u>, 396 A.2d 1090, 1095 (Md. 1979).  Thus, the question of an improper signature – if there was one here – is not dispositive as to whether there was an enforceable contract.

A draft of the Investment Agreement was provided to Ward and Moore in January 2014.  The trial court found, as a fact, that there were negotiations prior to the Investment Agreement's execution.  JA at 136 (Transcript, l. 15-17).

The trial court also found, as a fact, that each party had authority to enter into the Contract.   JA at 138 (Transcript, l. 17-21).  The Investment Agreement also states that the parties entered into it freely and voluntarily, JA at 75 (Investment Agreement, ¶ 11), and there is no contention they did not do so.  All of the elements of contract formation were present.

---

[7]/  At the most, it can be said that the error was in Mendieta's not writing "Acting" in front of "COO."

34

Even with no signature, the parties' conduct is sufficient to manifest acceptance and bind that party to the contract.  Porter, supra.  Here, MCG's acceptance of the Contract, and binding itself to it, is evidenced by its efforts made to timely open the Paragraph 4 bank accounts.  Similarly, the MGSJ Defendants' acceptance of the Contract is shown by what they claim to be their conduct, in that on February 19th the MGSJ Defendants were prepared to wire the $500,000 for operating capital, as the Investment Agreement provided.  JA at 89 (Supplemental Response).

There obviously was a contract: the MGSJ Defendants came to a presentation to hear about the product, financing was solicited, financing was promised, an agreement was negotiated and signed, and there was action following execution of the Contract consistent with its terms.  The trial court erred in finding there was no valid, binding agreement.

> 2.    MCG Cannot Be Deemed The Breaching Party.

> > A.    The Condition Of Opening The Bank Accounts Was A Condition Precedent, Excusing Performance Until Satisfied or Excused.

The trial court found that the "failure on the part of MCG to fulfill the terms of the agreement, prevented the formation of a contract."  JA at 138 (Transcript, l. 22-24).  In so finding, the trial court erred.

35

The trial court found that opening the bank accounts was a condition precedent.  Id. at 1. 25; JA at 139 (Transcript, l. 1-3).  A condition precedent is an event which must occur before the other party's performance under the contract becomes due, unless its non-occurrence is excused.  E.g. Chiricella v. Erwin, 310 A.2d 555, 557 (Md. 1973).

Here, opening the Paragraph 4 bank accounts was a condition precedent to Ward and Moore putting money into the accounts.  It does not negate the fact that there was a contract itself; it was only that the MGSJ Defendants' performance was not ripe until the bank accounts were opened, and that is what the trial court actually found.  JA at 139 (Transcript, 1. 1-3) ("... accounts must have been in place before Holdings was obliged to provide any funds ...).  If the MGSJ Defendants prevented the accounts from being opened, however, the condition could be excused and their performance due.

> B.   The "Circumstances" Determine Whether The Condition Precedent Must Be Fulfilled Before Performance Is Due, Or Excused.

The second error the trial court made was in finding that it does not matter why the condition was not fulfilled.  JA at 139 (Transcript, l. 3-5) ("the condition precedent was not fulfilled, regardless of the circumstances of its fulfillment") (emphasis added).  When one party prevents the other from fulfilling the condition

precedent, the condition precedent can be excused.  <u>Ambling Management</u>, <u>supra</u>.
Thus, why the condition was not fulfilled has <u>everything</u> to do with whether
performance is due.

 In finding breach, the trial court acknowledged that Mendieta may have had
"already engaged with Holdings and <u>was acting on Holdings' behalf at the time he</u>
<u>failed to engage in the signatory process</u>."  JA at 137 (Transcript, l. 22-25)
(emphasis added).  If Mendieta was "engaged with" and "acting on Holdings'
behalf" when he failed to provide the information necessary to open the Paragraph
4 bank accounts, then (1) the MGSJ Defendants prevented MCG from getting the
bank accounts open, and (2) the condition precedent could be excused.  If excused,
MCG could not be in breach of an excused condition.

## C. <u>The Time Period Was Too Short To Find Breach.</u>

 The trial court found MCG breached the Investment Agreement because
MCG did not get the Paragraph 4 bank accounts open prior to the MGSJ
Defendants abandoning it.  JA at 140 (Transcript, l. 24-25).  The Investment
Agreement was signed on February 12, 2014.  The 12th was a Wednesday.  The
13th and 14th were business days. The 15th and 16th were a Saturday and a Sunday,
and on Monday the 17th, banks were closed due to a snowstorm.  The 18th was a
business day.   On February 19th, the Investment Agreement was abandoned.

37

Thus, only 4 business days (the 12th, 13th, 14th, and 18th) passed between contract execution and abandonment.

The Investment Agreement did not specify when the Paragraph 4 bank accounts had to be opened. See JA at 73 (Investment Agreement, ¶ 4). When a contract does not specify the time of performance, it will be interpreted as intending performance in a "reasonable time." E.g., Giannaris v. Cheng, 219 F. Supp. 2d 687, 694 (D. Md. 2002). Accordingly the Paragraph 4 bank accounts had to be opened within a "reasonable time." Assuming that the Paragraph 4 bank accounts had to be opened within a "reasonable time," it was error for the trial court to hold that not getting the Paragraph 4 bank accounts open – which involved not only providing information, but also having the bank verify that information – in four business days, constituted a "failure of performance." JA at 137 (Transcript, l. 19).

As a contrasting example, in Havens v. Safeway, 678 P.2d 625 (Kan. 1984), a sub-contractor walked off the job after not being paid within 30 days; one invoice was paid six-days after 30 days, another 8 days after. Id. at 630. The Court characterized these delays as "minor," and held such minor delays would not justify the subcontractor's abandoning the contract. Id.

38

Here, at the most, there was a 7 calendar/4 business day period between contract execution and abandonment. If that can be characterized as a "delay," just as in <u>Havens</u>, that minor delay in getting the bank accounts open did not justify Ward's and Moore's abandoning the Investment Agreement.

        3.     MCG Did Not Ratify Mendieta's Supposed Cancellation Of The Contract.

As to the supposed ratification, the trial court held:

> All actions that were taken by Mr. Mendieta, <u>whether or not they were known or unknown to Mr. Hetzel and/or other directors of MCG</u> were ratified.

JA at 139-40 (Transcript, l. 24-25- l. 1) (emphasis added). The ratification resolution to which the trial court referred was as follows:

> RESOLVED: That any and all actions taken or contracts entered into heretofore by any officer and/or director for the Corporation, either as officer and/or director, as well as any and all actions taken or contracts entered into by said persons as individuals acting for the Corporation be and the same are hereby ratified, approved and confirmed by the Corporation, and all such contracts adopted as though said individual had at such time full power and authority to act for and by the Corporation and in the same manner as if each and every act had been done pursuant to the specific authorization of the Corporation.

JA at 95-97 (MCG Minutes [No. 67-3]).

As a threshold matter, to the extent the trial court based its ruling on the premise that Mendieta cancelled the Investment Agreement (and MCG ratified

that action), it is not undisputed that Mendieta took such action, much less on behalf of MCG, which should have precluded summary judgment on this ground. See Section III.A.3, re discussion re factual issues, supra. In any event, to the extent the trial court granted summary judgment on grounds that MCG ratified Mendieta's supposed cancellation of the Investment Agreement "whether or not [Mendieta's supposed cancellation was] known or unknown," that holding would be in error.

It has been long held, and apparently universally, that there can be no ratification when the ratifying party does not have knowledge of the material facts. Tower Oaks Blvd. v. Procida, 100 A.3d 1255, 1273 (Md. Ct. Spec. App. 2014) (for corporation to ratify an unauthorized act, it must have knowledge of all material facts concerning the act being ratified); see also Webb v. Duvall, 11 A.2d 446, 449 (Md. 1940) (corporation may ratify originally unauthorized acts but there is no ratification if not accompanied by knowledge of material facts concerning transaction); FDIC v. Staudinger, 797 F.2d 908, 911 (10th Cir. 1986) (ratifying party must have full knowledge of all material circumstances). Thus, the trial court erred when it held MCG ratified Mendieta's cancellation – assuming it happened – even if that action was unknown to MCG.

40

The only way the court could properly rely on the ratification resolution to grant summary judgment in the Defendants' favor would be if it was undisputed that, at the time it passed the ratification resolution, MCG knew that Mendieta had cancelled the Investment Agreement on its behalf. There is no such evidence. Indeed, the evidence in the record shows at the time of MCG's organizational meeting, MCG had no information suggesting that Mendieta had cancelled the Contract (and no reason to suspect he had done so, as the funds promised in the Investment Agreement were the funds MCG needed to bring its product to market). JA at 78 (Hetzel Aff. 2, ¶¶ 6-8).

The trial court's reliance on the ratification resolution was misplaced. [8]

---

[8]/ To the extent the trial court held that the ratification would not be effective because Mendieta had resigned (and thus would no longer be a proper signor on the bank accounts), JA at 140-41 (Transcript, l. 25- l. 1), there would be error in that holding, as a ratification relates back in time to the original contracting. <u>Tower Oaks</u>, 103 A.2d at 1272. Thus, MCG's February 25th ratification relates back to February 12th, when the Investment Agreement was signed. If the MGSJ Defendants prevented the condition of opening the bank accounts from happening or made it impossible (such as Mendieta and Ward, in their capacity as associated with Holdings, refusing to be signors), the condition would be excused, and all that would be left would be the MGSJ Defendants' performance. <u>See</u> <u>Sirsi v. Craven</u>, 815 F. Supp. 2d 931, 943 (E.D.N.C. 2011) (discussing principle [but in context of North Carolina law]).

41

### 4.   The Trial Court Improperly Dismissed Claims Against Mendieta.

### A.     Mendieta Was Not MCG.

The trial court, in dismissing the tort claims against Mendieta, found that Mendieta, being MCG's sole director, "was effectively MCG."  JA at 138 (Transcript, 1. 1-2) (emphasis added).  Mendieta, even though MCG's sole director, was not "effectively" MCG; it is hornbook law that a corporation has an identity separate from its directors.  1 Fletcher Cyclopedia of the Law of Corporations (2015 rec. ed.) § 7 at 70 (corporation enjoys a legal identify separate and apart from directors); see also id. at 65 (corporation and directors are not same personality); Danielwicz v. Arnold, 769 A.2d 274, 285 (Md. Ct. Spec. App. 2001) (in law, corporation has separate existence as a distinct person) (citing Waller v. Waller, 187 Md. 185 (1946)).

The trial court also held Mendieta owed no fiduciary duty to anyone but himself.  JA at 141 (Transcript, 1. 13-15).  Just as it is well-established that directors and corporations are not the same entity, it is equally well-established that directors have a fiduciary duty to the corporation.  Danielwicz, 769 A.2d at 285.

### B.  The Trial Court Used The Wrong Standard In Evaluating Mendieta's Actions.

The trial court recognized that Mendieta may have been acting in Holdings' interest when he failed to provide the information necessary to open the bank accounts.  JA at 137 (Transcript, l. 22-25).  Nonetheless, the trial court held:

> so even assuming somehow Mr. Mendieta had dealings, business dealings with Holdings in his capacity as a director of MCG, or outside of his capacity as a director of MCG, that was solely within his <u>sound discretion</u> and authority ...".

JA at 138 (Transcript, 1. 7-11) (emphasis added).

A director becomes "interested" when he or she has a relationship with the other party in a transaction.  <u>Shapiro v. Greenfeld</u>, 764 A.2d 270, 279-82 (Md. Ct. Spec. App. 2000) (when director actually involved in transaction, determination is "easy").  If, prior to February 19th, Mendieta, as MCG's sole director, had taken a financial  interest in Holdings, he was actually involved in the transaction at issue, and was clearly an "interested director."  <u>Id.</u>

If Mendieta was an "interested director" and his interest in Holdings was not disclosed to MCG, he must prove that his actions were "fair and reasonable" to MCG.  Corps & Ass'n, § 2-419(b)(2).  Instead of using the "fair and reasonable" standard, the trial court evaluated Mendieta's dealings by a "sound discretion" standard, JA at 138 (Transcript, l. 7-11), and thus erred.  This error was not

43

harmless, MCG submits, as there is no way Mendieta can show that his interference with MCG getting the funding it needed – whether it be his failure to provide the information necessary to open the Paragraph 4 bank accounts, or his supposed cancellation of the Investment Agreement – was "fair and reasonable" to MCG.

The tort claims against Mendieta – (1) deceit, for failing to reveal his interest in Holdings, and (2) interference with contract, for aligning himself against MCG and with Holdings – were well-pled. To the extent the trial court dismissed those claims because they arose during the time Mendieta was a director, the court erred by not evaluating those claims by the proper standard.

## CONCLUSION

For the reasons set forth above, MCG respectfully requests that the trial court's April 22, 2015 rulings be reversed and the case remanded so that a proper factual record can be developed and the proper standards be applied to that evidence.

Respectfully submitted,


_____/s/ Eric S. Lipsetts___
Eric Lipsetts
ERIC LIPSETTS, P.A.
7 Willow St., Suite 101
Annapolis, MD 21401
410-224-7631
410-573-1076
eric@lipsetts.com

Attorney for Appellant MCG, Inc.

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,041 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and including this Certificate of Compliance.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect X5 in Times New Roman, font size 14.

_/s/ Eric S. Lipsetts_
Eric Lipsetts
Attorney for Appellant
Dated: October 5, 2015

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF System, if they are registered users, or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven Mendieta (Appellee)
5622 Sage Hills Drive
Charlotte, NC 28277

_/s/ Eric S. Lipsetts_
Eric S. Lipsetts

46